### LYNCH v. AMERICAN LINSEED CO. et al.

(Supreme Court, Appellate Division, Second Department. June 8, 1906.)

1. MASTER AND SERVANT—INJURIES TO SERVANT—NEGLIGENCE OF MASTER—QUESTION FOR JURY.

In an action for injuries to a servant from being drawn into the leg of an elevator shaft for elevating grain, evidence *held* to present a question for the jury whether the master was negligent in not furnishing means to servants to prevent themselves from being drawn into the leg of the elevator shaft.

2. SAME—ASSUMPTION OF RISK—QUESTION FOR JURY.

In an action for injuries to a servant from being drawn into the leg of an elevator shaft for elevating grain, evidence *held* to present a question for the jury whether the servant assumed the risk of the injury.

Appeal from Trial Term, Richmond County.

Action by Jeremiah F. Lynch against the American Linseed Company and another. From a judgment in favor of defendant, entered on an order setting aside a verdict for $5,000 in favor of plaintiff and granting defendants' motion to dismiss the complaint at the close of the case, plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, HOOKER, RICH, MILLER, and GAYNOR, JJ.

Richard J. Donovan, for appellant.
Frederick Hulse, for respondents.

GAYNOR, J. This is an action for damages by servant against master for negligence. This is the second trial. On the first the plaintiff had a verdict for $10,000 but it was reversed here by a vote of

3 to 2 without opinion, but on the stated ground "that the plaintiff assumed the risk which resulted in the injury complained of." There was a dissenting opinion. 95 App. Div. 628, 88 N. Y. Supp. 1106. On this trial the learned trial judge reserved the defendant's motion at the close to dismiss until after verdict (which was for the plaintiff for $5,000), and then set the verdict aside and granted it.

The defendant was unloading a barge of linseed, by hoisting the grain up into its warehouse by means of an elevator. The leg of the elevator shaft was sunk down deep into the grain through the hatchway of the barge, and by means of steel buckets revolving with great rapidity on an endless chain inside the leg and shaft, the grain was drawn up through them into the warehouse. As the buckets revolved and took up the grain the leg was sunk deeper and deeper into the grain, until it went down to the bottom of the barge. The buckets were not visible to the workers. When all the grain around the leg had been exhausted, men were put into the barge to shovel the grain in toward the leg so that the buckets would continue to be buried in it and whirl it up. As the grain would grow exhausted around the leg the grain farther away would sometimes grow quick of its own weight and move down toward the leg. If men were put in, to shovel before a sufficient space was exhausted around the leg and the grain had consequently not yet ceased by its own gravity to move into the exhausted space close to the leg, it might carry a man along with it to the leg, which could not ordinarily happen later on. That is what happened to the plaintiff. He was hurried down the hatch by the foreman, and had to stand too near the leg for lack of space farther away. The grain where he stood immediately began to run, and drew him down to the leg, and his feet were caught by the buckets and greatly mangled before the machinery was stopped. His own story fully described the terrible scene and why he could not save himself:

"When the grain pulled me in I was about three and a half feet from the elevator leg. I grabbed around for something to catch hold of, I even tried to catch the wall, and tried to dig my finger nails into the side, and I looked around for a board or a rope; there was nothing there to save me; positively nothing."

It was no doubt for the jury to say whether the employer was not guilty of neglect of duty to his servants in not furnishing means for them to prevent themselves from being drawn down to the leg-buckets by the grain when it grew quick, such as the simple device of ropes extended taut across the boat from side to side, or hanging overhead from the deck ceiling, or along the sides, or of guard ropes or rails around the leg. This does not seem to have been questioned when the case was here before, nor is it seriously questioned now.

The verdict was set aside and the complaint dismissed on the sole ground that the servant assumed the risk. But it seems to me that it was a fair question of fact and not one of law whether there was an assumption of the risk by the servant. His testimony on this trial made it fairly plain, or at least questionable, whether he, a simple laborer, understood the danger of getting into the buckets, or that he could get into them. He testified quite fully about them and their exposed position on the first trial, which led to the reversal of his judgment, but ex-

plained on the second that much that he said on the first on that head he had learned after his hurt, especially from an engineer he knew. This is not at all improbable; indeed, it is a thing familiar to trial judges.

An assumption by the servant of a risk which it is the master's duty to remove can rarely be found as a question of law. All risks whether plain or obscure and uncertain, which are incident to the work, and cannot be avoided by the master in the fulfillment of his duty to provide his servant with safe appliances and a safe place to work, are assumed by the servant as matter of law, unless the master assume them by agreement. This is familiar to us all. But the risks which can be avoided by the master by fulfilling his said duty, are not assumed by the servant unless they be so plain and certain to him that it has to be said as matter of law that his working in the face of them was an assumption of them. Hawley v. Northern Central Railway Co., 82 N. Y. 370; Kain v. Smith, 89 N. Y. 375; Davidson v. Cornell, 132 N. Y. 228, 30 N. E. 573; McGovern v. C. V. R. R. Co., 123 N. Y. 280, 25 N. E. 373. If they be not so plain and certain as that, then the question becomes one of fact instead of law, with the burden of proof on the master (Dowd v. N. Y., O. & W. R. Co., 170 N. Y. 459, 63 N. E. 541); and that was this case on the second trial, for the case on that head was then materially different to what it was on the first trial. The accident happened immediately on the plaintiff getting down the hatch, where he was hurried by the foreman. It cannot well be said that he assumed the risk of his situation in the moment which ensued before the accident. If he had been sent down a little later, when the exhausted space would have been greater, and he could have got farther from the leg, the accident would probably not have happened at all.

On the second trial the jury were probably influenced in respect of the amount of the verdict by the uncertainty about the law of the case, and it seems to me that instead of reinstating the verdict we should order a new trial.

The judgment should be reversed and a new trial granted.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur.